17-934, 17-1149
*HealthBridge Management, LLC v. National Labor Relations Board*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2017
Nos. 17-934, 17-1149

HEALTHBRIDGE MANAGEMENT, LLC; 107 OSBORNE STREET OPERATING COMPANY
II, LLC D/B/A DANBURY HEALTH CARE CENTER; 710 LONG RIDGE ROAD OPERATING
COMPANY II, LLC D/B/A LONG RIDGE OF STAMFORD; 240 CHURCH STREET
OPERATING COMPANY II, LLC D/B/A NEWINGTON HEALTH CARE CENTER; 1 BURR
ROAD OPERATING COMPANY II, LLC D/B/A WESTPORT HEALTH CARE CENTER; 341
JORDAN LANE OPERATING COMPANY II, LLC D/B/A WETHERSFIELD HEALTH CARE
CENTER,
*Petitioners/Cross-Respondents*,

*v.*

NATIONAL LABOR RELATIONS BOARD,
*Respondent/Cross-Petitioner*.

ARGUED: MAY 31, 2018
DECIDED: AUGUST 23, 2018

Before:     JACOBS and DRONEY, *Circuit Judges*, UNDERHILL,* *District Judge*.

HealthBridge Management, LLC, and six healthcare centers that it operates
(collectively "HealthBridge") petition for review of a decision of the National

---

* Judge Stefan R. Underhill, United States District Court for the District of
Connecticut, sitting by designation.

Labor Relations Board ("the Board") finding that HealthBridge engaged in a number of unfair labor practices in violation of the National Labor Relations Act. See 29 U.S.C § 158(a)(1), (5). The Board cross-applies for enforcement of its remedial order.

The proceeding arises chiefly from the 15-month employment of certain HealthBridge workers by a management company retained by HealthBridge and their return to HealthBridge without seniority, tenure, and other features of their prior positions. Also in contention are several additional charges of unfair labor practices lodged by the employees' union. We deny the petition for review and enforce the Board's remedial order.

> BRIAN J. GERSHENGORN (*with* Seth D. Kaufman *on the brief*), Fisher & Phillips LLP, New York, NY, *for Petitioners/Cross-Respondents*.
>
> ERIC WEITZ (*with* Usha Dheenan, Supervisory Attorney, Linda Dreeben, Deputy Associate General Counsel, John W. Kyle, Deputy General Counsel, and Peter B. Robb, General Counsel, *on the brief*), National Labor Relations Board, Washington, DC, *for Respondent/Cross-Petitioner*.

DENNIS JACOBS, *Circuit Judge*:

HealthBridge Management, LLC and six healthcare centers that it operates (collectively "HealthBridge") petition for review of a decision of the National Labor Relations Board ("the Board") finding that HealthBridge engaged in a number of unfair labor practices in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C § 158(a)(1), (5). See HealthBridge Mgmt., LLC, 365 NLRB 37, 2017 WL 971615 (Feb. 22, 2017). The Board cross-applies for enforcement of

its remedial order. Our standard of review is well established, and we discuss it further below. See NLRB v. Katz's Delicatessen of Houston St., Inc., 80 F.3d 755, 763 (2d Cir. 1996).

The proceeding arises chiefly from the 15-month employment of certain HealthBridge workers by a management company retained by HealthBridge, and their purported rehiring by HealthBridge without seniority, tenure, and other features of their prior positions. At issue are the validity of the rehiring, and two related matters: the company's failure to rehire two of the workers, and its threat to call the police to quell worker dissatisfaction when the rehiring terms were announced. (Point II)

Also in contention are additional charges of unfair labor practices lodged by the employees' union based on HealthBridge's discontinuation of two practices: providing holiday premium pay for part-time and per diem workers, and counting lunch periods as time worked for purposes of calculating overtime. (Point III)

We deny the petition for review and enforce the Board's remedial order.

**I**

New England Health Care Employees Union ("the union") has represented bargaining units of workers employed at HealthBridge's healthcare centers since the early 1990s. These units include certified nursing assistants, cooks, central supply clerks, and the employees primarily at issue here: housekeeping and laundry workers (hereinafter "housekeeping workers"). The union and the various centers entered into materially identical collective bargaining agreements ("CBAs") that were effective from 2004 to 2011.

Article 9(F) of each CBA provided that "[n]o bargaining unit work shall be subcontracted unless the subcontractor agrees in advance to retain the Employees and recognize all their rights, including seniority, under this agreement." HealthBridge, 2017 WL 971615, at *1 n.7. "[A]ny purchaser, transferee, lessee, assign[ee]," "or other successor[]" was required to accept the

3

CBAs' terms and to honor any benefits accrued by the employees thereunder. Id.

In 2006, HealthBridge subcontracted the supervision of its housekeeping workers to Healthcare Services Group ("HSG"). HSG supplied on-site managers to supervise (and provided certain supplies) while the employees continued to perform the same work as before at the HealthBridge centers and remained on HealthBridge's payroll. The terms of the CBAs were given full effect during the three years of that arrangement.

In February 2009, HealthBridge and HSG entered into a full-service subcontract covering the housekeeping workers at three of the HealthBridge centers. Under the new arrangement, HSG assumed "all managerial and payroll responsibility" for the workers, who continued to perform the same work as before. Id. at *2. HealthBridge continued to run the centers, and workers in other bargaining units (such as certified nursing assistants) continued to work independently of HSG.

At the outset of this new arrangement, the 48 affected housekeeping workers were told simply that they were being "transferred to HSG's payroll"; they were not told that they were being laid off or otherwise terminated by HealthBridge, and they were not asked to apply for employment with HSG. Id. (internal quotation marks omitted). HealthBridge assured the union that "all [of the housekeeping workers'] accrued benefits, seniority and job status w[ould] [remain] intact and [that] HSG w[ould] agree to all terms and conditions of the contract between the Union and [HealthBridge]." Id.

Fifteen months later (several months before the expiration of the 2004-2011 CBAs), that subcontract arrangement ended. On May 17, 2010, the 48 housekeeping workers received individual letters from HSG informing them that they would "no longer be employed by" HSG and that "[p]ayroll services" would no longer "be provided" for housekeeping workers at the three relevant centers. Id. at *3 (internal quotation marks omitted). The workers were further informed that they would need to attend meetings at their respective centers to reapply for their jobs.

4

At each meeting, HealthBridge told the workers that those who wished to remain employed at the centers would need to apply for "rehire" by HealthBridge and that rehired workers would be treated as "new hires," without any of the seniority that they had accrued.   Id. (internal quotation marks omitted).   The upshot was that the rehired workers would lose up to a third of their hourly pay, as well as other contractual benefits, including job security and health insurance.   When, at one of the three centers, the housekeeping workers protested the new arrangement, the HealthBridge administrator in charge threatened to call the police to eject workers who did not either fill out a rehire application or leave the premises immediately.

Within 24 hours, 47 of the 48 workers applied for rehire.   All but two who applied were rehired either the same day or one day later.   (Not rehired were Newton Daye and Myrna Harrison, who had worked at HealthBridge for 13 and 22 years, respectively.)   The "'rehiring' interviews were 'non-existent, perfunctory or cursory,'" and "[m]ost employees returned to work the same day they were reemployed, continuing to do the same work they had performed before and during the full-service HSG subcontracts."   Id. at *4.   HealthBridge refused to honor the seniority of the 45 rehired workers, and the union responded by filing charges of unfair labor practices with the Board.

The proceedings before the Board also resolved charges that were unrelated to the rehiring of the housekeeping workers, and which affected other units as well.   Around 2009-10, HealthBridge ended two policies that had undisputedly been in place for the duration of the CBAs' term: (1) part-time and per-diem employees who worked fewer than 20 hours per week had been paid time-and-one-half plus an extra day's pay for hours worked on holidays, and (2) paid half-hour lunch periods had been counted as time actually worked for purposes of calculating overtime.   Around the same time, HealthBridge also ended longstanding policies pertaining to layoff notice and benefit eligibility. HealthBridge did not consult with the union prior to ending any of these polices.

The Board ultimately held HealthBridge liable for violations of the NLRA, and HealthBridge now challenges several of the underlying findings.   We reject

5

each of those challenges and enforce the Board's remedial order.

## II

HealthBridge challenges the finding that it violated the NLRA by temporarily requiring the housekeeping workers to work under a subcontractor only to rehire them as new employees following their termination by the subcontractor--thereby divesting them of seniority and related benefits accrued under the CBAs. See 29 U.S.C § 158(a)(1) (making it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of the[ir] right[]" to bargain collectively); id. § 158(a)(5) (making it unlawful for an employer to "refuse to bargain collectively with" its employees).

The Board adduced three rationales to support the conclusion that HealthBridge's use of the subcontracting arrangement violated the NLRA. But only one of those rationales commanded unanimity. The Board members disagreed among themselves as to whether HealthBridge was a joint employer of the subcontracted employees and as to whether HealthBridge ever terminated the employees. We need not consider those two rationales because we affirm the relevant portion of the Board's order only on the basis of the rationale to which all three Board members subscribed. The Board unanimously concluded that HealthBridge violated the NLRA because an employer may not use a "short-duration operational change[], [such as a] temporary shutdown[], . . . to circumvent union obligations [and] extinguish collectively bargained rights." HealthBridge, 2017 WL 971615, at *8-9 (internal quotation marks omitted). Applying that legal conclusion to the facts before it, the Board reasoned that HealthBridge unlawfully subverted its obligations to the union when it utilized the short-term subcontracting arrangement to eliminate union members' seniority-based rights.

We review the Board's decision for both its legal soundness and its factual basis. That review "is quite limited. We must enforce the Board's order where its legal conclusions are reasonably based, and its factual findings are supported by substantial evidence on the record as a whole." Katz's, 80 F.3d at 763 (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). As to legal

conclusions, we must give the Board "considerable deference" and afford the Board a "degree of legal leeway." NLRB v. Caval Tool Div., 262 F.3d 184, 188 (2d Cir. 2001) (citations omitted). And as to factual conclusions, remand is "warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by Board." Katz's, 80 F.3d at 763 (citation omitted); see also Caval, 262 F.3d at 188 ("Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

The Board's decision's is "reasonably based" in the NLRA. Katz's, 80 F.3d at 763. It is settled law in this circuit that an employer may not "avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations" that amounts to a "disguised continuance." Lihli Fashions Corp. v. NLRB, 80 F.3d 743, 748 (2d Cir. 1996) (quoting Truck Drivers Local Union No. 807 v. Reg'l Imp. & Exp. Trucking Co., 944 F.2d 1037, 1046 (2d Cir. 1991)). Thus, we have held that an employer may not in succession terminate its employees, cease its operations, form a new company to engage in the same business, hire back the same employees to perform the same work, and do so without honoring the parties' CBA. See id. at 747-48 (affirming the Board's finding of a violation of 29 U.S.C § 158(a)(1), (5)). Nor can an employer terminate its employees only to rehire a subset of them (to perform the same work), without regard to their seniority under the CBA, even if the employer shifts the putatively new employees onto the payroll of another entity. See NLRB v. G & T Terminal Packaging Co., 246 F.3d 103, 112, 117-18 (2d Cir. 2001) (same).

The Board's decision also finds substantial support in the law of other circuits, which have addressed legal arrangements that more closely resemble HealthBridge's actions. For example, other circuits have recognized that temporary shutdowns in business operations do not terminate unionized employees' rights under a CBA. See, e.g., NLRB v. Rockwood Energy & Mineral Corp., 942 F.2d 169, 175-76 (3d Cir. 1991) (holding that the Board could require a "post-hiatus employer" to respect the CBA seniority rights of employees of the pre-hiatus employer despite the five-year hiatus, in part

because the "employees had a continuing expectation of employment" throughout that period); El Torito-La Fiesta Restaurants, Inc. v. NLRB, 929 F.2d 490, 493-96 (9th Cir. 1991) (affirming a Board decision applying the terms of a pre-shutdown CBA to an employer following a 14-month shutdown in operations). The Tenth Circuit's decision in NLRB v. F&A Food Sale, Inc., in particular, shares many features with the instant appeal. See 202 F.3d 1258 (10th Cir. 2000). In that case, the employer subcontracted its unionized truckers' work to another company for a period of just over one year, with the agreement of the union. Id. at 1259. The subcontractor "operated from the same facility, used the same trucks, and employed substantially the same employees" during the subcontract period. Id. Following the end of the subcontract, the original employer resumed its own trucking operations, using the same facility, trucks, and most of the same employees. Id. at 1260. Nevertheless, the employer refused to recognize the union. Id. The Board concluded that the employer's refusal to recognize the union constituted an unfair labor practice. Id. On appeal, the Tenth Circuit affirmed, holding that the temporary hiatus in direct employment of the truckers did not allow the employer to disregard the CBA following the subcontract. Id. at 1260-62. We agree with these decisions of other circuits insofar as they supplement our own case law supporting the Board's legal conclusion that an employer may not use a "short-duration operational change[], including [a] temporary shutdown[]," to subvert the terms of a collective bargaining agreement. HealthBridge, 2017 WL 971615, at *8; see also G & T Terminal Packaging Co., 246 F.3d at 118 (noting that operational changes specifically motivated by "a desire to avoid [bargained-for] obligations" are likely to be found unlawful).

Substantial evidence supports the Board's factual determination that HealthBridge engaged in an unlawful scheme of this sort. "[T]he record," as the Board pointed out, is "even more indicative of unlawful conduct than [the record] presented in many [comparable] cases" of NLRA violations. HealthBridge, 2017 WL 971615, at *9 n.32 (internal quotation marks omitted). In such comparable cases, an employer terminates its employees, dissolves, reconstitutes itself as an alter ego entity, and rehires its old employees without the contractual entitlements of their prior positions. See, e.g., Lihli, 80 F.3d at 748-49. Here, the entity bound by the CBAs--HealthBridge--did much the same

8

thing without the hassle of a metamorphosis. HealthBridge effected its scheme by temporarily loaning its employees to a third-party subcontractor; but in no material way does that differentiate this case from our line of alter ego cases or the case law of other circuits holding that CBAs survive brief, manufactured breaks in direct employment. See, e.g., F&A Food Sale, 202 F.3d at 1260-62. As in those cases, the employees here were off-loaded and then rehired (without their contractual rights) to perform the same work, at the same site, for the same ultimate beneficiary. Insofar as there are distinctions, they do not assist HealthBridge: the third-party transactions through which HealthBridge (as it were) *laundered* its employees had the chief practical effect of divesting those employees of their contractual rights. Indeed, the record supports the conclusion that the dominant (if not sole) purpose of HealthBridge's use of the subcontractor was to *disguise* what amounts to a quasi alter-ego scheme.

Statements by HSG officials are evidence that HealthBridge always envisioned the subcontract as a temporary, technical arrangement that would conclude with HealthBridge re-absorbing the housekeeping workers, divested of their seniority-based benefits. As early as the Spring of 2009, an HSG manager informed a housekeeping worker and union delegate "on several occasions" that the housekeeping workers "would 'eventually be going back to [HealthBridge's] payroll.'" HealthBridge, 2017 WL 971615, at *3. Another HSG manager made similar statements to a different housekeeping worker in early 2010. In April 2010, still another HSG manager informed the union directly that the housekeeping workers "would be transferred back to [HealthBridge's] payroll"-- only to call the union "[a] few days later" to explain, "I shouldn't have said that," and that "the transfer back . . . [is] not a set plan." Id. at *3 & n.11 (internal quotation marks omitted). HSG managers testified that they were never informed of a legitimate business reason for the transfer; they were told by higher ranking HSG officials simply that "HealthBridge was taking the payroll back," that "the employees would no longer be on HSG's payroll," and that the workers would "be [HealthBridge's] employees" again. Id. at *4 (internal quotation marks omitted).

HealthBridge has failed to proffer evidence of a legitimate business purpose for its temporary payroll arrangement with HSG. At the

9

administrative hearing in this matter, HealthBridge called none of its management officials to testify as to why the company would briefly transfer its housekeeping workers to another entity's payroll before taking them back as supposed new hires. From this failure of proof, the Board drew the permissible adverse inference: the "apparent purpose" of HealthBridge's actions was to "extinguish" the employees' seniority-based entitlements. Id. at *9 (internal quotation marks omitted); see NLRB v. Dorn's Transp. Co., 405 F.2d 706, 713 (2d Cir. 1969) (noting that the Board may draw an adverse inference from a party's failure to call critical witnesses). A finding of illegitimate purpose is not necessary to a finding of an NLRA violation, but it is definitely telling on this record. See G & T Terminal Packaging Co., 246 F.3d at 118.

A successor employer that relinquishes and later reacquires ownership of an operation for *legitimate* business reasons may be free to negotiate a new CBA with the inherited employees. See Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, AFL-CIO, 417 U.S. 249, 261 n.5 (1974). In Howard Johnson, for example, the Supreme Court found that a successor employer was not bound by the CBAs entered into by its predecessor even though the successor had previously franchised the business to the predecessor. The Court reasoned that there was "not the slightest suggestion" that the arrangement "was in any sense a paper transaction" designed "to avoid the effect of the labor laws" "without meaningful[ly] impact[ing] . . . the ownership or operation of the enterprise." Id. The successor lacked an "ownership interest" in the enterprise immediately "prior to" the reacquisition, and "nothing in the record . . . indicate[d] that [the successor] had had any previous dealings with the Union, or had participated in any way in negotiating or approving the collective-bargaining agreements" at issue. Id.

The full-service subcontract with HSG did not meaningfully impact the ownership or operation of the enterprise: the housekeeping workers continued to service HealthBridge's centers in substantially the same manner throughout the period of the subcontract. While HSG performed supervisory and administrative services on HealthBridge's behalf, HealthBridge continued its control over the centers' operations. It handled grievances filed by the housekeeping workers and granted certain of their requests to transfer into other

10

departments.   Moreover, unlike the successor employer in <u>Howard Johnson</u>, HealthBridge had extensive prior dealings with the union as a party to the CBAs at issue.   Finally, the evidence suggests that HealthBridge designed the transactions at issue to evade its obligations under those CBAs.   "In these circumstances, . . . courts have had little difficulty holding that the [putative] successor is in reality the same employer and is subject to all the legal and contractual obligations of the [putative] predecessor."   <u>Id.</u>

For the foregoing reasons, sound legal reasoning and substantial evidence support the Board's determination that HealthBridge engaged in an unlawful scheme to "avoid the obligations of a collective bargaining agreement" in violation of the NLRA.   <u>Lihli</u>, 80 F.3d at 748 (internal quotation marks omitted). The obligations that HealthBridge attempted to shed remained binding, and no reasonable reading of those obligations permitted HealthBridge to eliminate the seniority-based entitlements of its housekeeping workers as it did.   The Board's application for enforcement of its remedial order as to this violation is therefore granted.

It follows directly from that ruling that the Board was correct in finding that HealthBridge committed two additional NLRA violations.   First, HealthBridge violated the NLRA by failing to "rehire" Newton Daye and Myrna Harrison when every other housekeeping worker who sought continued employment with the company was returned to its payroll.   <u>See</u> 29 U.S.C § 158(a)(1), (5).   Under the circumstances, the two employees' contractual seniority--properly honored--entitled them to retain their positions.   Second, HealthBridge violated the NLRA by threatening to call the police on workers who would not either immediately vacate the premises or accede to the unlawful elimination of their bargained-for seniority.   <u>See</u> <u>id.</u> § 158(a)(1).   This threat had "a reasonable tendency to coerce" the employees into relinquishing their collective bargaining rights.   <u>N.Y. Univ. Med. Ctr. v. NLRB</u>, 156 F.3d 405, 410 (2d Cir. 1998).   Accordingly, the portions of the Board's remedial order that address these two violations are also granted enforcement.

## III

HealthBridge challenges the finding that it violated the NLRA when it discontinued two of its policies: (1) part-time and per-diem employees who worked fewer than 20 hours per week had been paid time-and-one-half plus a regular day's pay for hours worked on holidays and (2) employees' paid half-hour lunch period had been counted as time actually worked for purposes of calculating overtime.   See HealthBridge, 2017 WL 971615, at *11-12 (citing 29 U.S.C § 158(a)(1), (5)).   An employer violates the NLRA when it discontinues an established policy, resulting in "chang[es] [to its] employees' wages, hours, and other terms and conditions of employment," "without [first] notifying and bargaining with the [employees'] collective bargaining representative."   Local Union 36, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB, 706 F.3d 73, 81 (2d Cir. 2013) (internal quotation marks omitted).   HealthBridge does not dispute that it unilaterally discontinued the policies, that they had been in place for the full course of the CBAs' term, and that there were effects on the employees' terms and conditions of employment.   HealthBridge contests the Board's findings solely on the ground that its actions were authorized under the CBAs.

We apply a "two-step framework" in cases involving unilateral changes to established policies, asking "(1) whether the applicable CBA clearly and unmistakably resolves (or 'covers') the disputed issue," and "(2) if not, whether the [union] has clearly and unmistakably waived th[e] right" to bargain over the disputed issue.   Id. at 79.   We decide de novo "whether a matter is 'covered' by the contract--meaning that the parties have already bargained over the matter and set out their agreement in the contract."   Id. at 83.   "Only if we conclude as a matter of law that the matter was not covered by the contract [do] we consider" the issue of waiver, reviewing any finding made by the Board for substantial evidence.   Id.

We conclude at step one that the CBAs cover the disputed issues and require HealthBridge to pay part-time and per-diem employees premium pay for holidays worked and to count employees' lunch period as time worked for purposes of overtime.   Accordingly, we affirm the Board's finding that HealthBridge violated the NLRA by discontinuing those policies without

12

attempting to bargain, and we grant the Board enforcement of its appropriately tailored remedial order.

**Holiday Pay.** Article 15(B) of the CBAs provides that "[i]n the event an Employee is required to work on any [of nine enumerated] holidays," "she/he shall be paid at the rate of one and one-half times her/his regular rate of pay for all hours worked . . . and shall *in addition* receive [either] an extra day's pay at her/his regular rate[] or an additional day off with regular pay." App'x at 353 (emphasis added). HealthBridge points to no provision (and we find none) defining the term "Employee" to exclude part-time or per-diem employees who work fewer than 20 hours per week, or any other class of employees. We therefore read "Employee" to have its ordinary meaning, which encompasses the employees in question.

HealthBridge seizes on this wording in Article 15(A): "Full-time or part-time Employees who work *twenty (20) hours or more* [per week] . . . shall be entitled to holiday pay at their regular straight time hourly rate . . . for each of [nine enumerated] holidays." Id. (emphasis added). HealthBridge contends that this provision limits eligibility for holiday *premium pay* to employees who work at least 20 hours per week. It plainly does not. Article 15(A) specifies the (limited) class of employees entitled to receive their *regular pay* for holidays on which *they do not work*; Article 15(B) establishes that all employees who *do* work on one of those holidays shall receive *premium pay*. The two provisions thus prescribe distinct benefits payable upon mutually exclusive conditions: going to work on a holiday, or staying home. Nor do they bear on one another, except insofar as the explicit limitation of the benefit in Article 15(A) to employees who work at least 20 hours per week suggests that the parties declined to similarly limit the benefit in Article 15(B).

HealthBridge argues that since Article 15(B) grants to employees who go to work on a holiday premium pay *in addition to* "an extra day's pay" at their regular rate, and Article 15(A) expressly limits "holiday pay at [one's] regular rate" to employees who work at least 20 hours per week, then only employees who work at least 20 hours per week can receive the benefit outlined in Article 15(B). Id. However, as explained above, the two provisions prescribe distinct

13

benefits payable upon mutually exclusive conditions.

Accordingly, the wording of Article 15(B) requires HealthBridge to maintain the policy that it discontinued.

Any doubt regarding the controlling contractual language is dispelled by the parties' course of performance.   See Marcic v. Reinauer Transp. Cos., 397 F.3d 120, 131-32 (2d Cir. 2005) ("[W]e may look to such evidence as . . . [the parties'] past practices [under the CBA].").   During the nearly six years that preceded HealthBridge's policy change, both the company and the union understood the CBAs to require HealthBridge to provide premium pay to all employees who worked on holidays.   The CBAs clearly "set out the[] [parties'] agreement" on the issue of eligibility for holiday premium pay, and as a result, HealthBridge was required to bargain over changes to the contractual arrangement.   Local Union 36, 706 F.3d at 83.   The record confirms the Board's finding that the company failed to do so in violation of the NLRA.

**Lunch Time.** Article 14(E) of the CBAs states that "Employees who, at management's request, work in excess of eight (8) hours per day shall receive one and one-half (1 1/2) times their regular . . . rate for hours actually worked in excess of eight (8) hours."   App'x at 351.   In a change of policy, HealthBridge now declines to count the half-hour lunch period toward the number of hours worked for purposes of overtime pay because the lunch period is not "actually worked."   However, Article 14 clearly treats the lunch period as time worked.

Article 14(A) explains that the "normal work week . . . shall . . . consist[] of eight (8) hours each day *including a paid lunch period* of one-half (1/2) hour."   Id. (emphasis added).   The provision further states that "[a]n employee who *works* a shift of six (6) hours or more shall *work* a shift inclusive of a one-half (1/2) hour paid meal period."   Id. (emphasis added).   Article 14 thus treats the lunch period as paid work time included in the eight hours that employees must work before qualifying for overtime pay.

The point is illustrated by Article 14(F), which provides that time spent on paid leave is counted as time worked for purposes of calculating overtime pay.

14

Time "actually worked" is therefore not limited to productive activity; the phrase more broadly covers work time that is paid. The phrase is not, however, surplusage or tautology; it would seem to exclude breaks in work that are not characterized as paid work time elsewhere in the CBAs. In sum, Article 14 entitles employees to have their guaranteed paid lunch periods included in the overtime calculation.

Once again, the parties' course of performance provides confirmation. Prior to the policy change at issue, the parties had always understood the CBAs that way and had acted accordingly. HealthBridge advances no convincing reason why this straightforward and consistent application of the contractual language was mistaken. The company's unilateral abandonment of that policy therefore amounted to another NLRA violation. See Local Union 36, 706 F.3d at 81.

*       *       *

The Board also found that HealthBridge violated the NLRA by unilaterally changing policies pertaining to layoff notice and benefit eligibility. HealthBridge does not challenge those findings in its petition for review. Accordingly, the Board is entitled to enforcement of the relevant portions of its remedial order. See NLRB v. Consol. Bus Transit, Inc., 577 F.3d 467, 474 n.2 (2d Cir. 2009).

## CONCLUSION

For the foregoing reasons, HealthBridge's petition for review is **DENIED**, and the Board's cross-application for enforcement is **GRANTED**.