**20-1163-ag**
*Int'l Bhd. of Elec. Workers, Local Union 43 v. NLRB*

In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2020

ARGUED: APRIL 23, 2021
DECIDED: AUGUST 12, 2021

No. 20-1163-ag

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL UNION 43,
*Petitioner*,

*v.*

NATIONAL LABOR RELATIONS BOARD,
*Respondent*,

*and*

ADT LLC,
*Intervenor*.

————

On Petition for Review of an Order of
the National Labor Relations Board.

————

Before: WALKER, LEVAL, and CHIN, *Circuit Judges*.

————

Local Union 43 of the International Brotherhood of Electrical Workers (the Union) petitions for review of a decision of the National Labor Relations Board (the Board) dismissing its unfair labor practice charges against ADT LLC (ADT). The Union alleges that, in September 2016, ADT violated Sections 8(a)(5) and (1) of the National Labor Relations Act (NLRA or Act) by refusing to bargain before implementing a mandatory six-day workweek for nearly all technicians at its facilities in Albany and Syracuse, New York. Applying a recently adopted "contract coverage" standard, the Board dismissed the charges on the basis that the plain language of the relevant collective-bargaining agreements (CBAs) permitted ADT's unilateral change to the schedule.

In this petition, the Union argues that the Board erred in construing the CBAs by failing to give effect to scheduling provisions that limit ADT's rights to mandate overtime. Adopting the contract coverage standard, we agree. We conclude that the CBAs did not allow ADT to unilaterally impose a mandatory six-day workweek and that ADT violated Sections 8(a)(5) and (1) of the Act by refusing to bargain before implementing the change. We therefore **VACATE** the Board's order and **REMAND** for further consideration consistent with this opinion.

––––––––

MANEESH SHARMA (Matthew J. Ginsburg, *on the brief*), AFL-CIO Office of the General Counsel, Washington, District of Columbia; Jonathan D. Newman, *on the brief*, Sherman Dunn, P.C., Washington, District of Columbia; Kenneth L. Wagner, *on the brief*, Blitman & King LLP, Syracuse, New York; *for Petitioner International Brotherhood of Electrical Workers, Local Union 43*.

GREG P. LAURO (Kira Dillinger Vol, *on the brief*), National Labor Relations Board, Washington, District of Columbia, *for Respondent National Labor Relations Board*.

JEREMY C. MORITZ (Norma Manjarrez, *on the brief*), Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Chicago, Illinois, *for Intervenor ADT, LLC*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Local Union 43 of the International Brotherhood of Electrical Workers (the Union) petitions for review of a decision of the National Labor Relations Board (the Board) dismissing its unfair labor practice charges against ADT LLC (ADT). The Union alleges that, in September 2016, ADT violated Sections 8(a)(5) and (1) of the National Labor Relations Act (NLRA or Act) by refusing to bargain before implementing a mandatory six-day workweek for nearly all technicians at its facilities in Albany and Syracuse, New York. Applying a recently adopted "contract coverage" standard, the Board dismissed the charges on the basis that the plain language of the relevant collective-bargaining agreements (CBAs) permitted ADT's unilateral change to the schedule.

In this petition, the Union argues that the Board erred in construing the CBAs by failing to give effect to scheduling provisions that limit ADT's rights to mandate overtime. Adopting the contract coverage standard, we agree. We conclude that the CBAs did not allow ADT to unilaterally impose a mandatory six-day workweek and that ADT violated Sections 8(a)(5) and (1) of the Act by refusing to bargain before implementing the change. We therefore **VACATE** the Board's order and **REMAND** for further consideration consistent with this opinion.

**BACKGROUND**

This case arises from ADT's decision to implement temporarily a mandatory six-day workweek for unionized technicians at its facilities in Albany and Syracuse, New York.  We begin by describing ADT's relationship with the Union, including the key terms of the CBAs governing ADT's right to adjust its technicians' schedules.  We then explain the facts giving rise to ADT's decision to impose a six-day workweek, the Union's demand that ADT bargain before implementing the policy, and the prior proceedings before the Board. We draw this background from the Board's findings of fact, which, unless otherwise noted, are supported by substantial evidence.[1]

## A.    The Collective-Bargaining Agreements

ADT installs and services security systems for residential and commercial property.  Like other companies in the industry, ADT hires local technicians to install and service its systems.  At two of ADT's facilities—those in Albany and Syracuse, New York—these technicians have elected to unionize.  They formed two bargaining units (one in Albany and another in Syracuse), both of which are represented exclusively by the Union.  As a general matter, ADT is required to bargain with the Union regarding employees' wages, hours, and other terms and conditions of employment.[2]

For decades, ADT and the Union successfully negotiated terms and conditions of employment for Albany and Syracuse technicians and memorialized their bargain in their successive CBAs.[3]  As a

---

[1] *See NLRB v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 763 (2d Cir. 1996).

[2] *See* 29 U.S.C. § 157; 29 U.S.C. § 158(a)(5).

[3] As relevant here, the CBA for the Albany technicians (Albany CBA) was effective June 11, 2015 to June 10, 2018.  The CBA for the Syracuse

general matter, the CBAs are broad in scope, addressing issues such as wages, benefits, safety, and the resolution of disputes. Most importantly for our purposes, they also contain the following three sections addressing ADT's right to set technicians' schedules.

First, Article 1, Section 2 of the CBAs describes ADT's management rights, which include a general right to determine the "amount" of work required of its technicians. It states, in relevant part, that "[t]he operation of the Employer's business and the direction of the working force including . . . the right to . . . determine the reasonable amount and quality of work needed . . . is vested exclusively in the Employer, subject, however to the provisions of this agreement."[4]

Second, Article 6, Section 1 of the CBAs defines the "Hours of Work" for Union technicians. It states that "[t]he workweek shall be forty (40) hours during any one workweek or eight (8) hours during any workday."[5] It also describes technicians' work schedules, which differ depending on whether the technician is assigned to the Service Department or the Installation Department. For technicians in the Service Department, the CBAs provide the following alternative schedules:

> The normal work schedule . . . shall be a shift of eight and
> one-half hours . . . comprising of five consecutive days
> [5x8 Workweek], Monday through Saturday between the
> hours of 8:00 a.m. and 12 midnight. There will also be a
> four-day workweek comprised of ten and one half hour

---

technicians (Syracuse CBA) was effective June 11, 2016 to June 10, 2019. Unless otherwise noted, the CBA provisions at issue are identical and we cite only to the Syracuse CBA.

[4] Joint App. at 134.

[5] *Id.* at 138.

shifts [4x10 Workweek] . . . between the hours of 8:00 a.m. and 12 midnight, Monday through Friday.[6]

For Technicians in the Installation Department, the CBAs provide a single schedule: "The Installation Department may be scheduled for any eight-hour period between 7:00 a.m. and 5:30 p.m. in any given day between Monday and Friday."[7]

Article 6, Section 1 also provides for limited departures from the regular schedules. For technicians in the Service Department, the CBAs provide that "[c]ustomer needs may periodically make it necessary for work to be performed beginning at 7:00 a.m."[8] For technicians in the Installation Department, they provide that "[c]ustomer needs may periodically make it necessary for work to be performed on a second shift and/or Saturdays."[9] Before assigning work beyond the regular schedule, however, the CBAs require ADT to follow certain procedures. For technicians in both departments, they provide, "The Company will first seek qualified volunteers to perform such work. If there are no qualified volunteers[,] then the least senior qualified person will be assigned to perform the work."[10]

Third, Article 6, Section 3 of the CBAs describes ADT's obligation to pay additional compensation for overtime. It states:

All time worked daily in excess of eight (8) hours in a scheduled 5 x 8 hour workweek, in excess of ten (10) hours in a 4 x 10 hour workweek, or weekly in excess of

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* The Albany CBA contains a slight variation of this sentence. It states: "Customer needs may periodically make it necessary to add an additional shift for residential installers from Tuesday through Saturday." *Id.* at 161.

[10] *Id.* at 138.

forty (40) hours, or on scheduled days off shall be compensated for at one and one-half (1½) times the employee's regular straight time hourly rate.[11]

## B.    The Mandatory Six-Day Workweek

In September 2016, the private equity firm Apollo Group purchased ADT and merged its operations with Protection One, Inc., one of ADT's competitors.   At the time, Protection One had a customer-retention policy of responding to 75 percent of service calls within 24 hours.  Recognizing the increased customer demand for fast and efficient service, Apollo Group decided to apply that same customer-retention policy to all of ADT's branches nationwide.

To meet the new customer service targets, ADT needed to reduce a backlog of open work orders at several of its locations. Accordingly, ADT announced on September 6 that it would implement a mandatory six-day workweek for service and installation technicians at nine branches in New York and Pennsylvania, including those in Albany and Syracuse.  At the Albany branch, the new policy would apply to all workweeks.   At the Syracuse branch, the new policy would apply only to the second and fourth workweeks of every month.[12]  In each case, ADT stated that the mandatory six-day workweeks would begin on September 22 and continue "until each market achieves the desired [customer service] target."[13]  While ADT acknowledged that the policy would burden its technicians, it stated that "the only exception at this time are those technicians that are currently attending classes and are enrolled in

---

[11] *Id.*

[12] In its email announcing the policy, ADT stated that the bi-weekly schedule at the Syracuse branch "can change to weekly if needed with no additional notice."  Joint App. at 131.

[13] *Id.* at 130.

higher education."[14]

The Union immediately objected to the new policy, demanded that ADT rescind it, and asserted that ADT violated the NLRA by failing to bargain with the Union before implementing the new schedule. Undeterred, ADT implemented the policy as planned, maintaining a mandatory six-day workweek for two to three months at its Albany branch and for one month at its Syracuse branch. During this time, ADT paid its employees overtime. It did not, however, seek volunteers before scheduling overtime shifts or, in the absence of sufficient volunteers, allocate shifts based on reverse seniority. Except for employees pursuing higher education, all service and installation technicians worked six-days per week as ordered.[15]

## C.     Prior Proceedings

Based on charges filed by the Union, the General Counsel for the Board issued a complaint alleging, *inter alia*, that ADT violated Sections 8(a)(5) and (1) of the Act by implementing the six-day workweek unilaterally—that is, without affording the Union notice or an opportunity to bargain.[16] On August 4, 2017, an administrative law judge issued a decision and recommended order finding that

---

[14] *Id.*

[15] ADT made another exception for an employee with childcare obligations, a decision the Board concluded violated the NLRA provision prohibiting direct dealing. *See ADT, LLC*, 369 N.L.R.B. No. 31, 2020 WL 996271, at *1, 8 (Feb. 27, 2020). That conclusion is not at issue in this petition for review.

[16] *See id.* at *1. Apart from this unilateral-change allegation, the General Counsel also asserted charges alleging that ADT modified the CBAs without the Union's consent, that ADT unreasonably delayed responding to information requested by the Union, and that ADT bypassed the Union when it exempted one Albany technician from the new schedule. *Id.* Only the General Counsel's unilateral-change allegation is at issue in this appeal.

ADT violated the Act as alleged.[17]   ADT filed exceptions to the recommend order and, on February 27, 2020, the Board reversed.[18] Applying a newly adopted "contract coverage" standard, the Board held that ADT had no duty to bargain with the Union because the plain language of the CBAs granted ADT the right to impose the six-day workweek unilaterally.[19]

The Board's analysis of the CBAs was brief.  It explained that "Article 6, [S]ection 3 of the Agreements provided for payment of overtime wages for work performed 'weekly in excess of forty (40) hours, or on scheduled days off,'" and that "Article 1, [S]ection 2 of the Agreements vested in [ADT] the exclusive right 'to determine the reasonable *amount* . . . of work needed.'"[20]   "Read together," it reasoned, "these provisions authorized [ADT] to determine the amount of work it needed the technicians to perform and to require its technicians to work in excess of 40 hours a week or on scheduled days off to accomplish that work."[21]   Although the Board acknowledged that ADT had failed to seek volunteers prior to assigning overtime, it held that any violations of the scheduling provisions were immaterial because "performance of the work was compulsory."[22]

The Union timely petitioned this court for review.

## DISCUSSION

On appeal, the Union argues that the Board erred by dismissing its charges under Sections 8(a)(5) and (1) of the Act on the basis that

---

[17] *Id.*

[18] *Id.*

[19] *See id.* at *4.

[20] *Id.* (emphasis added by the Board) (quoting the CBAs).

[21] *Id.*

[22] *Id.* at *4 n.9.

the CBAs permitted ADT's unilateral change to the schedule. It emphasizes that the management rights in Article 1, Section 2 are subject to the express limitations on scheduling in Article 6, Section 1, and that the overtime provisions in Article 6, Section 3 address ADT's obligations, not its rights. Because the CBAs expressly cabin ADT's scheduling rights, the Union argues that ADT violated the Act by failing to bargain before imposing the six-day workweek.

We agree with the Union and therefore vacate the Board's decision.

## I. Standard of Review

Our review of a Board's unfair labor practice determination is limited.[23] As to factual conclusions, we adopt the Board's factual findings to the extent they are supported by substantial evidence.[24] We will reverse based upon a factual question only "if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board."[25] As to legal conclusions, "[t]he judicial role is narrow."[26] We defer to the Board's interpretations of the NLRA—including with respect to the legal standard governing an unfair labor practice charge—as long as its interpretations are "rational and consistent with the Act."[27]

---

[23] *See Healthbridge Mgmt., LLC v. NLRB*, 902 F.3d 37, 43 (2d Cir. 2018).

[24] *Id.*

[25] *Katz's Delicatessen*, 80 F.3d at 763 (quoting *NLRB v. Albany Steel, Inc.*, 17 F.3d 564, 568 (2d Cir. 1994)).

[26] *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978).

[27] *Local Union 36, Int'l Bhd. of Elec. Workers v. NLRB*, 706 F.3d 73, 82 (2d Cir. 2013) (quoting *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 201 (1991)); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984) (requiring that, where Congress has delegated regulatory authority to an administrative agency, courts must defer to that agency's reasonable construction of the statute it administers).

We do not, however, defer to the Board's interpretation of a contract, including a CBA.[28]  "Although the Board has occasion to interpret collective-bargaining agreements in the context of unfair labor practice adjudication, the Board is neither the sole nor the primary source of authority in such matters."[29]  "[T]he interpretation of contracts falls under the special, if not unique, competence of courts," so we afford no deference to the Board in its interpretation of the CBAs.[30]

## II.    The Contract Coverage Standard

Congress enacted the NLRA to "redress the perceived imbalance of economic power between labor and management . . . by conferring certain affirmative rights on employees and by placing certain enumerated restrictions on the activities of employers."[31] Section 7 of the Act grants employees certain rights, including the right "to bargain collectively through representatives of their own choosing."[32]  Section 8(a)(1) prohibits employers from interfering with those rights, and Section 8(a)(5) specifically makes it an "unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of [its] employees."[33]  As we recently explained in *Healthbridge Management, LLC v. NLRB*,[34] an employer violates Section 8(a)(5) and, by extension, Section 8(a)(1) if it "discontinues an established policy, resulting in changes to its employees' wages, hours, and other terms and conditions of

---

[28] *Local Union 36*, 706 F.3d at 82.

[29] *Litton*, 501 U.S. at 202 (citation omitted).

[30] *Local Union 36*, 706 F.3d at 82.

[31] *First Student, Inc. v. NLRA*, 935 F.3d 604, 607 (D.C. Cir. 2019) (alteration in original) (quoting *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 316 (1965)).

[32] 29 U.S.C. § 157.

[33] *Id.* § 158(a)(5).

[34] 902 F.3d 37 (2d Cir. 2018).

employment, without first notifying and bargaining with the employees' collective bargaining representative."[35]   An employer does not violate these sections, however, "if the collective-bargaining agreement . . . grant[s] the employer the right to take [the challenged action] unilaterally (i.e., without further bargaining with the union)."[36]

While these statutory principles are straightforward, we must still decide which interpretive method to apply when determining whether a CBA grants an employer the right to take an action unilaterally.  This inquiry involves a question of law, so we defer to the Board as long as its approach is rational and consistent with the Act.

For many years, the Board employed a "clear and unmistakable waiver" standard for determining whether a CBA permitted an employer's unilateral change to an established policy.[37]  Under that standard, we asked whether the text of the CBA "unequivocally and specifically" permitted the employer's action such that the union could be said to have "waived" its right to bargain the issue.[38]  If the CBA contained "sufficiently specific" language authorizing the employer's action, the union's charges under Sections 8(a)(5) and (1)

---

[35] *Id.* at 46 (alterations and internal quotation marks omitted); *see also Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 373 (D.C. Cir. 2017) ("[A]n employer's violation of [S]ection 8(a)(5)'s duty to bargain also violates [S]ection 8(a)(1).").

[36] *MV Transp. Inc.*, 368 N.L.R.B. No. 66, 2019 WL 4316958, at *1 (Sept. 10, 2019).

[37] *See Local Union 36*, 706 F.3d at 82 (quoting *Fafnir Bearing Co. v. NLRB*, 362 F.2d 716, 722 (2d Cir. 1966)); *see also Provena St. Joseph Med. Ctr.*, 350 N.L.R.B. 808, 811 (2007) (describing the "clear and unmistakable waiver" standard).

[38] *Provena St. Joseph Med. Ctr.*, 350 N.L.R.B. at 811.

would fail.[39]   But if the CBA was ambiguous, or if it failed to "specifically refer[] to the type of employer decision" at issue, there would be no clear and unmistakable waiver of the union's right to bargain the issue and thus the union's charges could proceed.[40]

Recently, however, the Board abandoned its "clear and unmistakable waiver" standard in favor of a "contract coverage" test.[41]  As the Board explained in *MV Transportation*, parties to a CBA have *already* bargained with respect to any matter "covered by" the contract.[42]  Thus, "where the employer acts pursuant to a claim of right under the parties' agreement, the resolution of the refusal to bargain charge rests on an interpretation of the contract"—not on a "waiver" analysis.[43]  Because the question of waiver is irrelevant, the standard does not require a CBA to "specifically mention, refer to or address the employer decision at issue."[44]  Instead, it calls on courts to "apply[] ordinary principles of contract interpretation,"[45] recognizing that a CBA "establishes principles to govern a myriad of fact patterns" and "bargaining parties [cannot] anticipate every hypothetical grievance and . . . address it in their contract."[46]  In short,

---

[39] *Johnson-Bateman Co.*, 295 N.L.R.B. 180, 189 (1989); *see also Allison Corp.*, 330 N.L.R.B. 1363, 1365 (2000) ("[T]he Board looks to the precise wording of the relevant contract provisions in determining whether there has been a clear and unmistakable waiver.").

[40] *See U.S. Postal Serv. & Am. Postal Workers Union, AFL-CIO*, 306 N.L.R.B. 640, 643 (1992)).

[41] *MV Transp., Inc.*, 368 N.L.R.B. No. 66, 2019 WL 4316958, at *1.

[42] *Id.* at *11 (quoting *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993) ("[W]here the matter is covered by the collective bargaining agreement, the union *has exercised* its bargaining right and the question of waiver is irrelevant.")).

[43] *Postal Serv.*, 8 F.3d at 837.

[44] *MV Transp. Inc.*, 368 N.L.R.B. No. 66, 2019 WL 4316958, at *17.

[45] *Id.* at *2.

[46] *Id.* at *17 (alterations in original) (quoting *Postal Serv.*, 8 F.3d at 838).

the contract coverage standard asks only that we "examine the plain language of the collective-bargaining agreement to determine whether action taken by an employer was within the compass or scope of contractual language granting the employer the right to act unilaterally."[47]

The Board's opinion in *MV Transportation* is thorough and carefully reasoned. As the Board explained, the clear and unmistakable waiver standard tended to undermine contractual stability and alter the bargain reached by parties through negotiations.[48] Moreover, by requiring the Board to deny the effect of contract provisions that failed to meet the "exacting" requirements for a waiver,[49] the standard often caused the Board to sit in judgment upon contract terms—a circumstance specifically prohibited by the Supreme Court in *NLRB v. American National Insurance Co.*[50] The contract coverage standard obviates many of these deficiencies. Most importantly, it harmonizes the Board's interpretive approach with ordinary principles of contract interpretation while preserving meaningful limits on unilateral employer action.[51] For these reasons, we defer to the Board and adopt the contract coverage standard as rational and consistent with the Act.[52]

## III.    The Union's Unilateral-Change Allegations

Applying the contract coverage standard, we believe that the plain language of the CBAs did not permit ADT's unilateral decision

---

[47] *Id.* at *2.

[48] *See id.* at *6–8.

[49] *Id.* at *6.

[50] 343 U.S. 395, 404 (1952) ("[T]he Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.").

[51] *MV Transp., Inc.*, 368 N.L.R.B. No. 66, 2019 WL 4316958, at *13, 15.

[52] *See Litton*, 501 U.S. at 201.

to impose the six-day workweek.  We conclude that the scheduling provisions in Article 6, Section 1 restricted ADT's right to act unilaterally, and that the Board erred in construing other provisions of the CBAs to indicate otherwise.

To begin, Article 6, Section 1 reflects bargained-for restrictions on technicians' hours and work schedules.  For technicians in the Service Department, it sets forth two alternative schedules:  a "normal" schedule of eight-hour shifts for "five consecutive days, Monday through Saturday" (the 5x8 Workweek), and an alternative schedule of ten-hour shifts over "a four-day workweek, . . . Monday through Friday" (the 4x10 Workweek).[53]  For technicians in the Installation Department, Article 6, Section 1 sets forth a single permissible schedule:  employees in that department may be scheduled for "any eight-hour period between 7:00 a.m. and 5:30 p.m. in any given day between Monday and Friday."[54]  Each provision of the CBAs uses precise language to describe limited windows in which technicians may be scheduled.[55]  None of these schedules contemplates a six-day workweek, and nothing in either CBA grants ADT the right to impose a six-day schedule unilaterally.

Moreover, while the CBAs allow ADT to deviate somewhat from the regular schedules, Article 6, Section 1 expressly restricts the ways in which it may do so.  For technicians in the Service Department, Article 6, Section 1 states that "[c]ustomer needs may periodically make it necessary for work to be performed beginning at 7:00 a.m." rather than 8:00 a.m.[56]  For technicians in the Installation

---

[53] Joint App. at 138.

[54] *Id.*

[55] For technicians in the Service Department, this language is overtly mandatory.  *See id.* (stating that the normal schedule "shall be" a 5x8 Workweek and the alternative schedule "will . . . be" a 4x10 Workweek).

[56] *Id.*

Department, it states that "[c]ustomer needs may periodically make it necessary for work to be performed on a second shift and/or Saturdays."[57]  In either case, the CBAs specify a two-step procedure that ADT must follow before requiring the specific change in schedule.  First, ADT must "seek qualified volunteers to perform such work."[58]  Second, "[i]f there are no qualified volunteers," it must assign the work to "the least senior qualified person."[59]

ADT cannot justify its unilateral imposition of the six-day workweek under either of these exceptions.  With respect to technicians in the Service Department, Article 6, Section 1 does nothing more than permit ADT to begin a technician's schedule one hour early.  It does not grant ADT the right to schedule work outside the 5x8 or 4x10 Workweeks described in the CBAs.  With respect to technicians in the Installation Department, the plain language of the CBAs does allow ADT to impose an "additional shift," including on a sixth day of the week.  But it does not grant ADT unfettered discretion to schedule that shift.  As the Board noted, ADT did not comply with the two-step procedure:  it did not seek qualified volunteers and, failing sufficient volunteers, it did not assign unfilled shifts based on reverse seniority.  Instead, ADT decided for itself which employees would be required to take additional shifts and exempted all technicians pursuing higher education despite no basis in the CBAs for taking that approach.[60]  Thus, even if the CBAs could

---

[57] *Id.*  As noted above, the Albany CBA contains a slight variation of this sentence.  *See id.* at 161.

[58] *Id.* at 138.

[59] *Id.*

[60] ADT and the Board claim that we lack jurisdiction to consider this fact because the Union did not invoke it when arguing before the Board.  We disagree.  The Union preserved its argument that Article 6, Section 1 controlled this case, and the jurisdictional provisions in 29 U.S.C. § 160(e)

have granted ADT the right to impose a six-day workweek on *some* technicians, it failed to meet the contractual prerequisites for doing so unilaterally.

The Board's decision did not address the scheduling provisions in Article 6, Section 1. Instead, it focused on Article 6, Section 3, which requires ADT to pay overtime wages for work performed "weekly in excess of forty (40) hours, or on scheduled days off,"[61] and on Article 1, Section 2, which vests in ADT the exclusive right "to determine the reasonable amount . . . of work needed."[62] The Board concluded that, when read together, these provisions grant ADT broad rights to determine the appropriate "amount" of work and to schedule overtime as required to accomplish that work.[63] This construction of the CBAs was error for at least two reasons.

First, the Board's interpretation failed to recognize that the management rights granted to ADT by Article 1, Section 2 are "subject . . . to the [remaining] provisions of the [A]greement[s]," including the scheduling provisions in Article 6, Section 1.[64] Thus, while Article 1, Section 2 grants ADT broad rights to determine the "*amount . . . of work*" required, its authority to *schedule* that work is constrained by the specific provisions of Article 6, Section 1.[65] As discussed, those provisions do not permit ADT to require a sixth day of work for technicians in the Service Department. And while they permit ADT to periodically assign Saturday shifts to technicians in the Installation

---

do not prevent counsel from marshalling additional undisputed facts to support an argument raised below.

[61] Joint App. at 138.

[62] *Id.* at 134.

[63] *ADT, LLC*, 369 N.L.R.B. No. 31, 2020 WL 996271, at *4.

[64] Joint App. at 134.

[65] *Id.* (emphasis added).

Department, the CBAs still require compliance with the two-step procedure.

Even without the express language stating that ADT's management rights were "subject . . . to" the remaining provisions of the CBAs, a broadly worded management right ordinarily will not give an employer *carte blanche* to disregard specific limits on that authority.[66] It is a well-recognized tenet of contract interpretation that "specific terms and exact terms are given greater weight than general language."[67] And it is well settled that courts should not adopt an interpretation that leaves a provision of a contract without force or effect.[68] The Board's interpretation does just that. It elevates general language to nullify specific contractual terms and renders meaningless the Union's negotiation of four- or five-day workweeks, maximum workday hours, and limited exceptions to the agreed-upon schedules. We cannot endorse this interpretation.

Second, the Board's interpretation mistakenly concluded that Article 6, Section 3 grants ADT a *right* to mandate overtime work. The overtime provisions do not grant rights to ADT. Instead, they simply impose a duty on ADT to pay overtime "at one and one-half (1½) times the employee's regular straight time hourly rate" whenever that employee works "in excess of eight (8) hours in a [5x8 Workweek], in excess of ten (10) hours in a [4x10 Workweek], or weekly in excess of

---

[66] *See MV Transp., Inc.*, 368 N.L.R.B. No. 66, 2019 WL 4316958 at *2 n.6 ("[I]f the agreement contains a matrix of progressive discipline for safety violations that *must* be followed, the general contractual right to revise existing policies would not privilege the employer to dispense with progressive discipline for safety violations.").

[67] *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (quoting Restatement (Second) of Contracts § 203(c) (1981)).

[68] *See Kelly v. Honeywell, Int'l, Inc.*, 933 F.3d 173, 183 (2d Cir. 2019); *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

forty (40) hours, or on scheduled days off."[69]  In other words, the overtime provisions guarantee that Union employees receive overtime compensation when they volunteer for additional work beyond their schedule.  Whether viewed independently or in connection with the management-rights provisions, they do not grant ADT a right to mandate overtime on whatever schedule it desires.

Despite these two errors in the Board's analysis, the Board and ADT advance additional arguments in this petition for review that they claim support the Board's construction of the CBAs.  They argue that the Union's interpretation would leave the management-rights provisions without force and effect, that the scheduling provisions were not binding on ADT because they referred only to "normal" workweeks, and that it would have been a mere formality for ADT to comply with the two-step procedure.  They further argue that the Union cannot press its unilateral change allegations because they collapse into its contract modification allegations, which are not the subject of this appeal.  On each of these arguments, we are unpersuaded.

First, ADT and the Board contend that the Union's interpretation, not theirs, would render portions of the CBAs without force or effect.  They argue that, by enforcing the scheduling provisions of Article 6, Section 1, we would "negate the purpose of the management-rights and overtime provisions that grant ADT the right to determine the 'amount' of work required and to assign overtime, including on regular days off."[70]  This argument has it backwards because the Union's construction gives effect to each provision of the CBAs.  Once ADT exercises its exclusive right to determine the "amount" of work needed, it may direct the operations

---

[69] Joint App. at 138.
[70] *See* Resp't's Br. 25.

of the company in numerous ways, including by (1) requiring overtime in a manner consistent with the scheduling and overtime provisions, (2) soliciting volunteers to work additional overtime outside the scheduled hours, or (3) increasing the number of technicians it employs. ADT could also bargain with the Union to alter the scheduling provisions. Until then, however, Union technicians retain their right to work within the range of their negotiated schedules.

Second, ADT and the Board contend that the scheduling provisions do not bind ADT because Article 6, Section 1 describes only "normal" work schedules for Union technicians. This argument is meritless. As discussed, Article 6, Section 1 uses specific and restrictive language when describing its technicians' work schedules. The phrase "normal work schedule" appears only in the paragraph setting forth schedules for technicians in the Service Department and, when read in context, does nothing more than distinguish the "normal" 5x8 Workweek from the alternative 4x10 Workweek. The CBAs do not use the word "normal" when describing the work schedule for technicians in the Installation Department because the parties agreed to only one schedule for those employees.

Third, ADT and the Board argue that it would have been a mere formality for ADT to comply with the two-step procedure by seeking volunteers before assigning Saturday shifts by reverse seniority. While they acknowledge that the two-step procedure was binding, they emphasize the Board's finding that ADT "was in an 'all hands on deck' situation" such that "it was assigning overtime to all of the technicians, whether they would have volunteered or not."[71] But this argument amounts to little more than a futility defense to a breach of contract; it does not bear on whether the CBAs themselves permitted

---

[71] *ADT, LLC*, 369 N.L.R.B. No. 31, 2020 WL 996271, at * 5.

ADT to enact the policy unilaterally. And while we need not go further, we are not persuaded that the Board's factual finding on this issue is supported by substantial evidence. The record shows that ADT did not assign work to "all of the technicians" because it exempted all employees enrolled in higher education.

Finally, ADT and the Board argue that we should reject the Union's unilateral-change theory because its interpretation of the CBAs better reflects a contract-modification theory that the Union waived on appeal. As the Board has explained, there are analytical distinctions between unilateral-change cases and contract-modification cases. The issue in a unilateral-change case "is whether the contract *privileges* the [employer's] conduct," while the issue in a contract-modification case "is whether the contract *forbade* the [employer's] conduct."[72] According to the Board, the Union argues "not that the contract did not privilege ADT's action," but rather "that the schedule provisions forbade the action and that ADT violated the contract by modifying it mid-term."[73] We are not convinced.

The distinction the Board draws—whether a contract "privileges" or "forbids" an employer's action—is little more than semantic when the contract coverage standard applies. Under ordinary contract principles, contractual language that expressly or impliedly *forbids* a unilateral action plainly does not *privilege* it. The Board itself recognized this when adopting the contract coverage standard in *MV Transportation*. It observed that, "if an agreement contains a provision that broadly grants the employer the right to [take an action unilaterally], the employer would not violate Section 8(a)(5) and (1) by unilaterally [taking that action] . . . [*p*]*rovided, of*

---

[72] *Bath Iron Works Corp.*, 345 N.L.R.B. 499, 502 (2005).

[73] Resp't's Br. 28 (emphasis added).

*course, that no other provision of the agreement limits the employer's right of action.*"[74]

Moreover, we see no basis to dismiss the Union's unilateral-change theory simply because the Union's allegations are also consistent with a contract-modification theory. When an employer defends its failure to bargain by invoking a claim of right under a CBA, the analysis of a unilateral-change theory may overlap with the analysis of a contract-modification theory because both theories turn on ordinary principles of contract interpretation.[75] And while the two theories offer different remedies,[76] a union may choose which course to pursue. Here, the Union advanced both theories in the alternative when litigating before the Board, but it presses only its unilateral-change theory on this petition for review. Accordingly, we decide only that ADT violated the Act by refusing to bargain before imposing the six-day workweek in the manner we have described. We have no need to decide whether ADT also violated the Act by modifying the contract mid-term.

---

[74] *MV Transp., Inc.*, 368 N.L.R.B. No. 66, 2019 WL 4316958, at *2 & n.6 (emphasis added); *see also Healthbridge*, 902 F.3d at 47–48 (finding that employer violated Section 8(a)(5) of the Act by failing to bargain before changing a condition of employment where the CBA addressed the issue and prohibited the employer from changing the condition unilaterally).

[75] *See Pac. Mar. Ass'n v. NLRB*, 967 F.3d 878, 891 (D.C. Cir. 2020) (observing that the contract coverage analysis "overlap[s]" with the analysis governing a contract-modification claim).

[76] In a unilateral-change case, the remedy is an order requiring the employer to bargain in good faith. *Bath Iron Works*, 345 N.L.R.B. at 501. If the negotiations reach an impasse, the employer's duty to bargain further is temporarily suspended and the employer may change the terms and conditions of employment unilaterally. *See Emhart Indus., Hartford Div. v. NLRB*, 907 F.2d 372, 376 (2d Cir. 1990). In a contract modification case, the remedy is an order requiring the employer to honor the CBA as drafted. *Bath Iron Works*, 345 N.L.R.B. at 501.

\*      \*      \*

In summary, we adopt the "contract coverage" test as the governing standard for determining whether a CBA permits an employer's unilateral change to an established policy.  Applying that test here, we find that (1) the CBAs did not grant ADT the right to unilaterally impose a mandatory six-day workweek on technicians in the Service Department at all, and (2) the CBAs did not grant ADT the right to unilaterally impose a mandatory six-day workweek on technicians in the Installation Department without complying with the two-step procedure.  Accordingly, we conclude that ADT violated Sections 8(a)(5) and (1) of the Act by failing to bargain with the Union before implementing the change.

## CONCLUSION

For the foregoing reasons, we VACATE the Board's decision and REMAND for further proceedings consistent with this opinion.